Leon CHASTANT

v.

**HEADRICK OUTDOOR, INC.**

Civ. A. No. 93–1824.

United States District Court,
W.D. Louisiana,
Lafayette Division.

Feb. 15, 1995.

Lamont P. Domingue, Voorhies & Labbe, Lafayette, for plaintiff Leon Chastant.

George Arceneaux, III, Liskow & Lewis, Lafayette, for defendant Headrick Outdoor, Inc.

## *OPINION*

NAUMAN S. SCOTT, District Judge.

Trial of this matter was held before Judge Nauman S. Scott on December 2, 1994 in Lafayette, Louisiana. In this case we are called upon to determine whether the plaintiff, Leon Chastant ("Chastant"), is entitled to terminate two leases with Headrick Outdoor, Incorporated ("Headrick"). In the event we find that the leases are no longer valid, we are also asked to decide who owns the billboards that Headrick erected on those leases.

After considering the trial testimony and the record as a whole, we find that the plaintiff is entitled to terminate both leases. However, we nonetheless find that Headrick remains the owner of the structures. Under Louisiana Civil Code article 493, Headrick has ninety days from the date when this judgement becomes final to remove the structures and return the land to its former condition; in the alternative, the parties may agree that Chastant purchase the structures. La.Civ.Code Ann. art. 493 (West 1994).

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as conclusions of law. To the extent that any of the conclusions of law are findings of fact, they are adopted as findings of fact.

### *FINDINGS OF FACT*

1. On October 7, 1985, Chastant entered into a notarized agreement whereby he leased his property at 3636 Ambassador Caffery, Lafayette, Louisiana to Headrick. Besides investing Headrick with leasing rights, the agreement allowed Headrick to erect a 14' × 48' outdoor billboard on the property.

2. Under this lease, Headrick agrees to pay Chastant $2,500.00 per year for these rights. However, no time for payment of rent is mentioned in the agreement. Also, the agreement states that it binds the parties for a minimum period of fifteen years.

3. The following is the history of payments on the Ambassador Caffery lease.

| Year | Date of Check | Date Check Was Processed |
|---|---|---|
| 1985 | Not Available (N/A) | N/A |
| 1986 | 10/19/86 | Same Day (wire transfer) |
| 1987 | 10/14/87 | 10/23/87 |
| 1988 | N/A | N/A |
| 1989 | 10/10/89 | 10/30/89 |
| 1990 | 11/21/90 | 12/4/90 |
| 1991 | * Headrick sent a letter dated 1/2/91 explaining its financial troubles and stating that payment may be thirty days late. | |
| | ** The next correspondence is a letter from Chastant's agent dated 1/6/92. In the letter, Chastant's agent states that the Ambassador Caffery rent was due in October of 1991 and asks that Headrick pay its bills on time. | |
| | *** The check that Headrick sent to cover the 1991 period is dated 3/6/92. This check was processed on 3/16/92. | |
| 1992 | 3/11/93—Chastant refused tender of this check.* In a letter dated 3/23/93 Chastant states that the lease is in default for failure to pay timely rent. The letter also asks Headrick to remove the signs from his land in no less than less than ten working days from receipt of the letter. Chastant later received other checks but refused tender. | |

4. We find that the rent is due in October. Headrick's records support this finding. Their computer records show the date of the lease as 10/7/85. Even more persuasive is the fact that these records state: "annual lease payment due in month—10." Joint Trial Exhibit Book, Exhibit 4. In addition, Ray Cole, Headrick's Secretary, Treasurer and C.E.O., testified that Headrick's practice was to pay rents on the anniversary of the lease. Finally, the history of payment provides strong support for our finding. Between 1986 and 1990, Headrick paid in October in three out of the four years for which figures are available.

5. Accordingly, we find that Headrick was approximately[1] twenty-one days late in

---

1. Throughout this opinion, we use "approximately" to describe dates and periods. We use this

1990, approximately four months and six days late in 1991, and approximately four months and eleven days late in 1992.

6. On January 14, 1986, Chastant entered into another notarized agreement with Headrick, this time leasing his Kaliste Saloom road property. Like the Ambassador Caffery lease, this lease allowed Headrick to erect a billboard.

7. In return for the lease rights to the Kaliste Saloom road property, Headrick agrees to pay Chastant $2,000.00 per year or 10% of the net annual income, whichever is greater. Also, like the Ambassador Caffery agreement, no time for payment is provided in the lease. The lease term is identical to the Ambassador Caffery lease.

8. The following is the history of payments on the Kaliste Saloom road lease.

| Year | Date of Check | Date Check Was Processed |
|------|---------------|--------------------------|
| 1986 | 1/17/86 | 1/24/86 |
| 1987 | N/A | N/A |
| 1988 | N/A | N/A |
| 1989 | 1/19/89 | 1/30/89 |
| 1990 | 1/22/90 | 2/5/90 |

1991 * The letter Headrick sent dated 1/2/91 also pertained to this lease. Again, that letter explained that the rent might be thirty days late.

** The 1991 payment on this lease was made by check dated 2/20/91. The check was processed on 2/27/91.

1992 * Chastant, through his agent, sent a letter dated 1/6/92 complaining about late payments on the Ambassador Caffery lease. This is the same letter mentioned in the history of the Ambassador Caffery lease. The letter also stated that the Kaliste Saloom rent was "due this month," meaning in January.

** The 1992 payment was made by check dated 3/6/92. This check was processed on 3/16/92.

1993 * In the same letter in which he attempted to terminate the Ambassador Caffery lease, Chastant also attempted to terminate the Kaliste Saloom lease for failure to pay rent on time. Again, this letter is dated 3/23/93. Headrick attempted to make the 1993 payment by check dated 3/25/93; however, Chastant refused tender.

9. We find that the rent on the Kaliste Saloom lease is due in January. Headrick's computer records show the date of the lease anniversary as 1/14/86. The records also state: "annual lease payment due in month—1." Finally, for the three years for which

term because we can not pin point the dates on which Chastant received his rental payments; we can only use to the dates on the checks and the dates on which the checks were processed to estimate the date on which rent was paid.

information is available between 1986 and 1990, Headrick paid in January.

10. Accordingly, we find that Headrick was approximately twenty days late in 1991, approximately one month and six days late in 1992, and approximately one month and twenty-five days late in 1993.

11. In addition, Stephen Sonnier, Headrick's market manager for Lafayette, testified that he received complaints from either Chastant or his agent, Byron Alleman about late payments on both leases. Byron Alleman also testified about making these complaints. Although Headrick possesses no record's verifying such complaints, Cole testified that Headrick throws away any records of verbal complaints after a week passes.

## CONCLUSIONS OF LAW

### Jurisdiction And Choice Of Law

Plaintiff, a Louisiana resident, brings this action against defendant, a Mississippi corporation. Because this court sits in diversity under, 28 U.S.C. section 1332, we apply Louisiana law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### Rent Was Due In October For The Ambassador Caffery Lease And In January For The Kaliste Saloom Lease

■ While both leases are silent as to when the rental payments are due, we find that the rent on the Ambassador Caffery lease is due in October and in January for the Kaliste Saloom lease. When the parties have made no provision for a particular situation, they are bound by "whatever the law, equity, or usage regards as implied in a contract of that kind...." La.Civ.Code Ann. art. 2054 (West 1994). After considering the testimony at trial, Headrick's established practice of making payments, and the specific history of rental payments under both leases, we find that due dates of October and January are implied in the leases.

Headrick argues that Louisiana's version of the parol evidence rule bars us from con-

Because of this dilemma, we have generally used "approximately" followed by the dates which appear on the checks to estimate the times of payments. We are satisfied that we have accurately fixed the payment dates.

sidering evidence outside of the four corners of the leases. Civil Code article 1848 reads as follows:

> [t]estimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement. La. Civ.Code Ann. art. 1848 (West 1994).

While article 1848 states only that extrinsic evidence cannot be introduced to negate or vary a contract, Headrick asserts that this article also prohibits admitting such evidence to add to a contract. Headrick relies on *Lapeze v. Amoco Production Company,* 655 F.Supp. 1, 5–6 (M.D.La.1987), *aff'd on other grounds,* 842 F.2d 132 (5th Cir.1988).

In *Lapeze,* Eugene Shilling executed a mineral lease in favor of Amoco Production Company. However, the lease incorporated an erroneous land description that was contained in the Act of Partition. A group of Shillings relatives, including the plaintiffs in the case, executed an Act of Correction in order to correct the property description in the Act of Partition. Amoco later filed suit to reform the lease to reflect the correct property description. After the suit was filed, the parties reached a settlement which resulted in an Act of Correction to the lease. The Correction amended the property description and raised the royalty but stated that otherwise the old lease would remain in full effect. Plaintiffs were later granted ownership of Eugene Shilling's land. After Amoco made a payment to Eugene Shilling, now deceased, plaintiffs brought suit alleging that the Act of Correction changed the payees/lessors under the lease. They argued that the effect of the settlement agreement and the subsequent Act of Correction was to substitute their names for Shilling's as lessor/s under the lease. *Id.* at 2–6. The United States District Court for the Middle District of Louisiana found that the intent of the Act of Correction was clearly only to correct the land description and raise the royalty, not to change the lessor/s. *Id.* at 6. Citing former Civil Code article 2276 [2], the court held that extrinsic evidence could not be considered to vary or go "beyond" the terms of the contract. *Id.*

*Lapeze* does not control this case. The *Lapeze* court addressed a case in which intent was clear. Because the court had clear evidence of the intent of the parties, it had a reference point from which to determine that the extrinsic evidence would vary the contract. In this case, the leases contain no evidence of the intent of the parties as to when the rent is due. Of course, we have the arguments of both sides; but what is most clear to us is that there was no meeting of the minds on this issue.

This case requires us to imply due dates in the leases. In order to determine whether the rental payments were late and thereby determine whether termination was proper, we must establish when the rent is due. Headrick argues that it "should not be charged with additional unwritten obligations." Post Trial Memorandum On Behalf Of Headrick Outdoor, p. 3. Instead, Headrick argues that since no due dates exist, it could pay at "any reasonable time in the lease terms." However, while Headrick eschews the idea of being charged with additional unwritten obligations, Headrick suggests that we impose due dates of "any reasonable time" on Chastant. It seems to us that whether we set the due dates on specific days or at "any reasonable time" we are still imposing due dates.

In addition, the specific language of article 1848 does not prevent us from implying due dates. Nowhere in the text of the article or in the comments is this situation addressed. Article 1848 contains a prohibition against admitting evidence to vary or negate a contract; it does not address gap filling.

Gap filling is addressed in Civil Code article 2054. Article 2054, titled "No provision

---

2. While article 2276 had been superseded by the time *Lapeze* was decided, the court nonetheless chose to rely on it for the principle that a court may not admit extrinsic evidence to add to or go beyond the contract terms. The *Lapeze* court also relied on a case interpreting the precursor statute to article 2276 for this principal. *Id.* at 5–6.

of the parties for a particular situation," pro-vides:

> [w]hen the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. La.Civ.Code Ann. art. 2054 (West 1994).

After considering both the text and comments of articles 1848 and 2054 and after noting that 1848 speaks to only "varying" and "negating," we find that article 2054 controls this case.[3] Since the parties did not specify due dates, we must resort to the law, equity and usage to provide them.

■ After considering these guideposts, we find that the rent is due in October under the Ambassador Caffery lease and in January under the Kaliste Saloom lease. As we pointed out *supra*, Headrick's records clearly list the dates of the leases as "10/7/85" for the Ambassador Caffery lease and "1/14/86" for the Kaliste Saloom lease. Joint Trial Exhibit Book, Exhibits 4 & 8. The records also state "annual lease payment due in month—10," for the Ambassador Caffery lease and ". . . in month—1," for the Kaliste Saloom lease. *Id.* In light of fundamental business concepts, we hardly think Headrick put these dates into its computer database, and consistently paid on these dates, in order to be early on its payments. If Headrick is so confident that the rent was due "sometime in the first half of the rental year," as its counsel alleges, why did it consistently pay early and lose the interest on the money? This argument is contrary to standard and profitable business practices.

In addition, Ray Cole, a Headrick representative, testified that Headrick's longstanding practice was to pay in the month of the anniversary of the lease. The records of

checks tendered clearly evidence this practice. See History in Findings Of Fact *supra*.

At the other extreme, Chastant and his agent, Byron Alleman, testified that the rent was due on the *day* of the anniversary of the leases. We cannot accept this conclusion. The records show that Chastant repeatedly accepted the rent in the *month* of the lease anniversary. Arguably, this continued late acceptance would amount to acquiescence in new due dates. However, since we find that there was no "meeting of the minds" as to due dates, we need not entertain this argument; we need only rely on Civil Code article 2054.

In sum, the nature of this suit requires us to determine the due dates for the leases. Civil Code article 2054 provides the manner in which we are to determine these dates. Law, equity and usage compel us to imply due dates of October and January in the leases.

### Chastant Had The Right To Terminate And Did So Properly

■ Since the rental payments were late on both leases, Chastant had a right to terminate them. Under Civil Code articles 2710 and 2712, the lessee is bound "to pay the rent at the terms agreed on," and "may be expelled from the property if he fails to pay the rent when it becomes due." La.Civ.Code Ann. arts. 2710, 2712 (West 1994). The rent on the Ambassador Caffery lease was due in October of 1992. Headrick did not tender this payment until approximately March 11, 1993, approximately four months and eleven days late. In response to this late payment, Chastant sent a letter dated March 23, 1993 placing Headrick in default and giving him ten days to vacate the premises. Joint Trial Exhibit Book, Exhibit 11. This letter complied with Louisiana Code Of Civil Procedure article 4701 which states that when a lessee's right of occupancy has ceased because of

---

3. While former versions of article 2054 and cases interpreting those former versions may have prohibited the admission of extrinsic evidence to "add to" the contract, we do not find this history persuasive. As we note, gap-filling is not addressed by article 1848.

Even if we accept that the historic judicial and legislative gloss outlined above currently prohib-

its admitting extrinsic evidence to "add to" contract terms under article 1848, such an interpretation of article 1848 conflicts with the clear terms of article 2054. Faced with this conflict, we favor the application of the clear language of 2054 over the extrapolation of an historic interpretation onto article 1824.

". . . nonpayment of rent, . . . the lessor shall cause written notice to vacate the premises to be delivered to the lessee. The notice shall allow the lessee not less than five days from the date of its delivery to vacate the leased premises." La.Code Civ.Proc.Ann. art. 4701 (West 1994). Since Headrick was late and since Chastant sent proper notice, Chastant properly terminated the lease.

■ We are aware of the line of cases applying the theory of acquiescence to alter a lease's due date. *Investor Inns, Inc. v. Wallace*, 408 So.2d 978 (La.App.2d Cir.1981). However, this theory is inapplicable where the lessor makes frequent demands for payment or where the lessor accepts late payments because of unwilling and forced indulgence on the lessor's part. *Id.* Since we find that this theory does not apply, we now return to our analysis of proper termination.

Chastant also properly terminated the Kaliste Saloom lease. Although 1993 rent was due in January, Headrick did not tender a check until approximately March 25, 1993. Prior to receiving this check, Chastant sent the termination letter discussed above; that letter is dated March 23, 1993. Accordingly, Chastant refused tender of the March 25 check. As we noted above, the termination letter complied with Louisiana Code Of Civil Procedure, article 4701.

### Headrick Remains The Owner Of The Structures

■ Headrick remains the owner of the billboards because when the owner a of structure on another's land no longer has the right to keep the structure there, the owner has 90 days following written demand to remove it. La.Civ.Code Ann. art. 493 (West 1994). Since Chastant has already sent a written demand for removal, Headrick has 90 days from the date when this judgment becomes final to remove the structures.

Article 493 states that buildings or "other constructions" permanently attached to another's land with his consent belong to the party that made them. *Id.* The law is settled that permanent billboards qualify as "other constructions" under article 493. *Beacham v. Hardy Outdoor Advertising, Inc.*, 520 So.2d 1086, 1087–1088 (La.App. 3rd Cir.1987). The remaining relevant part of article 493 states as follows:

> [w]hen the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner. La.Civ.Code Ann. art. 493 (West 1994).

Therefore, Headrick must remove the structure within 90 days of final judgment and return the land to the condition it was in prior to construction or Chastant becomes the rightful owner. Of course, the parties are free to bargain over the billboards.

■ We are not persuaded by Chastant's argument that he is now the rightful owner since 90 days has elapsed since he sent the notice dated March 23, 1993. Under Louisiana law, the cancellation of a lease for nonpayment of rent is effective only when a court grants termination and possession. *Porter v. Johnson*, 369 So.2d 1141, 1142 (La. App. 1st Cir.1979). Since we only now cancel the lease, the 90 day period starts when this judgement becomes final. We could require that Chastant send a new written demand but that would be pointless. We find that his prior demand satisfies article 493.

### Headrick Owes Rent Until It Removes The Structures

■ Because Headrick's billboards have remained on Chastant's property, Headrick owes rent dating back to the last accepted rental payments on both leases. Headrick is hereby also required to pay rent on the leases up until the date when the structures are removed and the land is returned to its former condition.

### CONCLUSION

We hereby find that plaintiff, Chastant, properly terminated both the Ambassador Caffery and the Kaliste Saloom leases. We also find that Headrick remains the owner of

the structures erected on the leases, subject to its duty to remove the same and return the property to its former condition within the statutory period.

DONE AND SIGNED.